J-S50016-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: INVOLUNTARY TERMINATION OF PARENTAL RIGHTS TO N.D.B., A MINOR | : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.A.B., NATURAL FATHER | : : | No. 37 MDA 2016 |

Appeal from the Decree December 9, 2015,
in the Court of Common Pleas of Centre County
Orphans' Court at No: 2015-4027 A

BEFORE:  MUNDY, STABILE, FITZGERALD*, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED JULY 11, 2016**

A.A.B. ("Father") appeals from the decree entered December 9, 2015, in the Court of Common Pleas of Centre County, which involuntarily terminated his parental rights to his minor son, N.D.B. ("Child"), born in September of 2012.[1]  We affirm.

The orphans' court summarized the factual and procedural history of this matter as follows.

> [Centre County Children and Youth Services ("CYS")] has been involved with Mother and Father for several years in relation to their other children.  [Child] is Mother's sixth child, and CYS has been involved with her since 2006.  Mother's

---

* Former Justice specially assigned to the Superior Court.

[1] The parental rights of Child's mother, K.S.P. ("Mother"), were involuntarily terminated by the same decree.  Mother has not filed a brief in connection with the instant appeal, nor has she filed her own separate appeal.

parental rights to her first four children were involuntarily terminated, and her parental rights to her fifth child were voluntarily terminated. Mother indicated to counsel she wished to voluntarily terminate her rights to [Child], but failed to appear in court to do so at either of the two hearings for this matter.

[Child] is Father's third child. CYS has been involved with Father intermittently since 1997. Father's first child is in the care and custody of the paternal grandparents, and he has not had significant periods of custody of his second child. Father has a history of substance abuse, mental health problems, incarceration, and financial and housing instability. From April 22, 1994, through December 3, 2013, Father had fifteen separate periods of incarceration, including time for an arrest for driving under the influence [("DUI")] in 2012, and an arrest for driving with a suspended license in 2013. During the same timeframe, Father spent 753 days in prison and owes $8,439.00 in fines and costs for eleven cases in the Centre County Office of Probation and Parole.

CYS began involvement again upon learning Mother was pregnant with [Child]. CYS was concerned with Mother['s] and Father's mental and emotional health, home conditions, financial troubles, parenting skills, and their relationship problems. Mother and Father failed to cooperate with CYS prior to [Child's] birth. . . .

Orphans' Court Opinion, 12/9/15, at 1-2.

CYS obtained an order for emergency protective custody of Child on the day Child was born. Petitioner's Exhibit 2 (Order for Emergency Protective Custody). Child was adjudicated dependent on September 19, 2012. Petitioner's Exhibit 5 (Order of Adjudication and Disposition). On October 14, 2013, Child's permanency goal was changed to adoption.[2]

_____

[2] While Child's permanency goal was changed to adoption in October of 2013, the record reveals that reunification services were ended months earlier, on May 15, 2013. *See* N.T., 5/14/15, at 75-76.

Father appealed from the goal change order, which was affirmed by a panel of this Court on December 19, 2014. ***See In the Interest of: N.D.B.***, 116 A.3d 693 (Pa. Super. 2014) (unpublished memorandum).

On February 13, 2015, CYS filed a petition to involuntarily terminate Father's parental rights to Child. A termination hearing was held on May 14, 2015, and June 26, 2015, during which the orphans' court heard the testimony of CYS caseworker, Rebecca McKinley-Walsh; Family Intervention Crisis Services ("FICS") reunification program director, Molly Funk; former CYS caseworker, Lindsay Schreffler; CYS caseworker, Tammi Eddy; and Father. Following the hearing, on December 9, 2015, the orphans' court entered its decree terminating Father's parental rights. Father timely filed a notice of appeal on January 6, 2016, along with a concise statement of errors complained of on appeal.

Father now raises the following issues for our review.

I. Did the [orphans' c]ourt err in involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. Sec. 2511(a)(2)?

II. Did the [orphans' c]ourt err in involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntary termination pursuant to 23 Pa.C.S.A. Sec. 2511(a)(5)?

III. Did the [orphans' c]ourt err in involuntarily terminating Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an

involuntary termination pursuant to 23 Pa.C.S.A. Sec. 2511(a)(8)?

IV. Did the [orphans' c]ourt err in involuntarily Father's parental rights where CYS did not prove by clear and convincing evidence all of the elements required to effectuate an involuntarily termination pursuant to 23 Pa.C.S.A. Sec. 2511(b)?

Father's Brief at 4.

We consider Father's claims mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*), *appeal denied*, 863 A.2d 1141 (Pa. 2004). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be

beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

We first address whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted)). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

Instantly, the orphans' court found that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being, and that the conditions and causes of Father's incapacity, abuse, neglect, or refusal cannot, or will not, be remedied. Orphans' Court Opinion, 12/9/15, at 5-6. The court reasoned that Father

- 6 -

has a history of criminal activity, homelessness, drug and alcohol use, deficient parenting skills, failure to cooperate with CYS, and overall instability. *Id.* at 5. The court concluded that Father continues to struggle with these same problems. *Id.* at 5-6.

Father argues that he has remedied the issues which resulted in Child's placement in foster care. Father's Brief at 13-20. In the alternative, Father contends that he has made sufficient progress such that he will be able to remedy those issues within a reasonable period of time. *Id.* at 19. Father insists that he parented Child appropriately during his visits, that he has obtained stable housing, and that he has attended counseling in order to address his other issues. *Id.* at 17-19.

After a thorough review of the record in this matter, we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child. During the termination hearing, FICS reunification program director, Molly Funk, testified that FICS opened its case with respect to Father on October 11, 2012. N.T., 5/14/15, at 49. FICS prepared a Family Reunification Services Agreement, pursuant to which Father was required to secure and maintain stable housing, manage his money carefully, show that he can care for Child, and take care of himself by cooperating with services, among other things. *Id.* at 51-52.

With respect to Father's housing, Ms. Funk testified that Father was residing with Mother at his parents' home at the time FICS began providing

services. *Id.* at 52. Father's parents informed FICS that Father would only remain at their home temporarily, and FICS instructed Father that he would need to obtain his own residence in order to demonstrate that he could live a stable lifestyle. *Id.* at 52-53. Father did not obtain his own housing until January of 2013. *Id.* at 53, 103. Moreover, by March of 2013, Father was again spending extended periods of time living with his parents. *Id.* at 63, 103.

Concerning visitation, Ms. Funk explained that Father attended his visits with Child consistently. *Id.* at 54, 64, 78, 80. However, Father was resistant to accepting feedback from FICS service providers with respect to appropriate parenting techniques, such as how to prepare a bottle. *Id.* at 56-57, 81, 94. Father showed "minimal progress" in terms of his ability to care for Child. *Id.* at 64. Father demonstrated that he was able to meet Child's needs, but only with prompting by FICS staff. *Id.* at 66, 86, 108, 143.

With respect to services, Ms. Funk testified that Father attended Catholic Social Services, where it was expected that he would receive anger management counseling. *Id.* at 59. During that time, Father's counselor at Catholic Social Services reported to FICS that Father was not willing to work on anger management, because he did not see it as a problem. *Id.* at 59, 97. In March of 2013, Father indicated that he would no longer be attending Catholic Social Services, and that he would instead be attending anger

management and drug and alcohol counseling at Quest. *Id.* at 59. Father's only explanation for leaving Catholic Social Services was that "he began to work on some personal issues, and he was no longer comfortable in attending there so he was looking for counselling elsewhere." *Id.* Father also attended drug and alcohol services at Clear Concepts, but Father's counselor reported that Father did not want to work on drug and alcohol issues, so they would work on parenting instead. *Id.* at 61. Ms. Funk noted that Father was dismissive of his anger management and drug and alcohol issues, and "stated to our agency on many occasions that everybody has anger, and everybody uses drugs." *Id.* at 59-60, 107. Ms. Funk also described a conversation she had with Father during which he discussed his prior DUI charge. *Id.* at 137. Father received this charge for driving after "using marijuana and snort[ing] Vicodin[.]" *Id.* Father refused to accept responsibility for the incident, "saying the police were lying, and he didn't know that driving while using marijuana was considered a DUI." *Id.*

Finally, Ms. Funk testified that Father appeared to have an inappropriate relationship with Mother. *Id.* at 68-69. During visits, Father would instruct Mother that she was not allowed to do things without his permission. *Id.* at 82. Father also told Mother that she was "stupid" on multiple occasions. *Id.* at 56, 122. Mother reported to FICS that she was fearful of Father, and that Father would yell and curse at her. *Id.* at 68-69.

CYS caseworker, Tammi Eddy, testified that she was assigned to this case in September of 2013, and "officially took it over" on October 1, 2013. N.T., 6/26/15, at 55. With respect to Father's parental capacity, Ms. Eddy testified that she does not believe that Father is capable of raising Child. *Id.* at 97. Ms. Eddy acknowledged that Father is able to parent Child in the context of a two-hour supervised visit, but she expressed concern with respect to Father's ability to maintain Child's safety without supervision. *Id.* at 102. Ms. Eddy confirmed that Father "presents as verbally aggressive and hostile" and that he is resistant to accepting suggestions from service providers. *Id.* at 72-73, 94-95. Ms. Eddy explained that Father had a particularly poor relationship with a previous service aide. *Id.* at 62-63. In April of 2014, the service aid asked to be removed from supervising and transporting Father to visits. *Id.* at 70. The service aide refused to work with Father without someone else being present, and reported that Father was "very threatening to her." *Id.* at 70-71.

Concerning Father's relationship with Mother, Ms. Eddy testified that that Father and Mother married on September 11, 2013. *Id.* at 65. Father and Mother separated and reunited several times, until Father filed for divorce on March 31, 2015. *Id.* at 65, 70, 75-76, 88. On May 4, 2015, Ms. Eddy received a phone call from Mother, who indicated that she left Father, and that she filed for a Protection From Abuse ("PFA") order against him. *Id.* at 90. Mother alleged that, throughout her relationship with Father, he

would scream at her, attack her, and state that it was his right to do so because he owned her. *Id.* Mother also described an incident during which she engaged in a "scuffle" with Father. *Id.* at 91. When Mother attempted to leave the home, Father shut the door on her hand. *Id.* Mother finally was able to flee to a neighbor's house and, for the remainder of the day, Father "canvassed the neighborhood" trying to find her. *Id.* Ms. Eddy explained that Father filed for a PFA against Mother on May 6, 2015. *Id.* Mother's PFA against Father was dismissed, because Mother failed to appear at the hearing. *Id.* at 133. Father did appear at his PFA hearing, and an order was entered on his behalf against Mother. *Id.* at 133-34.

Accordingly, the record supports the conclusion of the orphans' court that Father is incapable of parenting Child, and that Father cannot, or will not, remedy his parental incapacity. When provided with the opportunity to participate in reunification services, Father was resistant to accepting suggestions from service providers, and he refused to address his drug and alcohol and anger management issues. Tellingly, Father testified during the termination hearing that he has not attended counseling since his most recent incarceration, and that he does not believe that counseling is necessary.[3] N.T., 6/26/15, at 175, 177, 226. In addition, Father has

---

[3] Our review of the record indicates that Father's most recent incarceration resulted from his arrest for driving with a suspended license in October of
*(Footnote Continued Next Page)*

engaged in an unstable and possibly abusive relationship with Mother, which further supports the court's determination that Father is incapable of parenting Child in a safe and appropriate manner.

We next consider whether the orphans' court abused its discretion by terminating Father's parental rights pursuant to Section 2511(b). We have discussed our analysis under Section 2511(b) as follows.

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

_____
_(Footnote Continued)_

2013. **_See_** N.T., 6/26/15, at 63-64. Father was incarcerated until December of 2013. **_Id._**

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)) (quotation marks and citations omitted).

Here, the orphans' court found that Child has little, if any, bond with Father. Orphans' Court Opinion, 12/9/15, at 9. The court noted that Child has spent his entire life in foster care, and regards his foster parents as his parents. *Id.* The court concluded that Father remains incapable of parenting Child, and that it would best serve the needs and welfare of Child to terminate Father's parental rights. *Id.*

Father argues that CYS failed to present clear and convincing evidence that terminating his parental rights would serve the needs and welfare of Child. Father's Brief at 20-21. Father contends that he and Child are bonded. *Id.* at 20. Father further emphasizes that CYS failed to obtain a bonding evaluation, and that CYS did not provide expert testimony in support of its position that terminating Father's parental rights would not have a detrimental impact on Child. *Id.*

We again conclude that Father is not entitled to relief. Ms. Eddy testified that Child is comfortable with Father during visits, but that he is more attached to his foster parents, and views his foster parents as his parents. N.T., 6/26/15, at 79, 100-01. Child calls Father "daddy, but when the door to the visit room is open, he runs to the [foster parents]." *Id.* at 79-80. Thus, the record confirms that Father and Child do not share a parent/child bond, and that Child's parent/child bond is with his foster

- 13 -

parents. While Father is correct that CYS did not present a bonding evaluation or other expert testimony during the termination hearing, it is well-settled that a court in a termination proceeding "is not required by statute or precedent to order a formal bonding evaluation be performed by an expert." **In re K.K.R.-S.**, 958 A.2d 529, 534 (Pa. Super. 2008) (citation omitted). It is clear that Child's needs and welfare will best be served by terminating Father's parental rights.

Accordingly, because we conclude that the orphans' court did not abuse its discretion by involuntarily terminating Father's parental rights to Child, we affirm the decree of the orphans' court.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/11/2016